THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA

v.   CRIMINAL ACTION NO. 2:10cr57

MOHAMED ALI SAID,
    a/k/a Maxamad Cali Saciid,
MOHAMED ABDI JAMA,
    a/k/a Mohammed Abdi Jamah,
ABDICASIIS CABAASE,
    a/k/a Ahmed Mahomood,
ABDI RAZAQ ABSHIR OSMAN,
    a/k/a Abdirasaq Abshir,
and
MOHAMED FARAH,
    a/k/a Mahamed Farraah Hassan,

    Defendants.

## *MEMORANDUM OPINION AND ORDER*

Before this Court is Defendants Mohamed Ali Said, Mohamed Abdi Jama, Abdicasiis Cabaase, Abdi Razaq Abshir Osman, and Mohamed Farah's Joint Motion for Ruling Regarding Inapplicability of Statutory Mandatory Minimum Punishment for Piracy Offenses. Dkt. No. 245. For the reasons stated below, Defendants' Motion is **GRANTED**. The parties are **DIRECTED** to submit supplemental memoranda addressing the sentence to be imposed for the piracy charge within **TWENTY-ONE (21) DAYS** of the date of entry of this Order.

## I. PROCEDURAL AND FACTUAL HISTORY

The Second Superseding Indictment provides a concise description of the relevant

1

underlying facts in this case. Dkt. No. 140. Defendants' names have been shortened to only their last names for brevity.

> 1. In and around the early to middle part of February 2010, the exact date being unknown, defendants Said, Jama, Cabaase, along with Jama Idle Ibrahim and others, went to sea in a boat with the intent to hijack a ship and hold the ship and its crew for ransom. Their boat carried weapons and tools to be used in the hijacking.
>
> 2. On or about February 26, 2010, [they] again went to sea with the intent to hijack a ship and hold the ship and its crew for ransom. Their boat carried weapons and tools to be used in the hijacking, including but not limited to one or more AK-47 firearms, a handgun, and a hooked ladder for boarding another vessel.
>
> 3. On or about February 27, 2010, [they] were transiting the Gulf of Aden in their boat. They were intercepted by the HMS Chatham (F-87), a frigate of the Royal Navy, which deployed its helicopter and smaller boats to interdict [them]. Before they were stopped and boarded by sailors from the HMS Chatham, the conspirators threw several weapons and their hooked ladder overboard. When they were stopped and questioned, the conspirators made false statements about their activities, that is, one or more of the conspirators claimed to be human smugglers.
>
> 4. On or about April 9, 2010, the defendants, Said, Jama, Cabaase, Osman, and Farah, along with Ibrahim and another individual, again went to sea, specifically, the Gulf of Aden, with the intent to hijack a ship and hold the ship and its crew for ransom. The conspirators carried, among other things, firearms and a hooked ladder for boarding another vessel.
>
> 5. On or about April 10, 2010, shortly before sunrise, [they] approached a vessel they had been following. One of the conspirators raised an AK-47 and began firing. The vessel under attack was in fact the USS Ashland, of the United States Navy.
>
> 6. On or about April 10, 2010, after their boat had been hit by return fire from the USS Ashland, [they] agreed to make false statements and to tell the Navy and government that they were human smugglers who had become stranded at sea.

Second Superseding Indictment at 2-4. As this Court has previously noted, "[a]t no time did Defendants board or attempt to board the USS Ashland." *United States v. Said*, 757 F. Supp. 2d 554, 557 (E.D. Va. 2010).

One of the pirates, un-named in the Second Superseding Indictment, was killed after the *Ashland* responded to their attack. The others were apprehended and eventually transported to

2

this District, and on April 21, 2010, Defendants and co-defendant Jama Ibrahim were named in a five-count Indictment. On July 7, 2010, they were named in an eight-count Superseding Indictment. On August 17, 2010, the Court dismissed Count One of the Superseding Indictment, which charged the defendants with piracy under 18 U.S.C. § 1651, reasoning that their conduct did not fall within "the crime of piracy as defined by the law of nations." *Said*, 757 F. Supp. 2d 554. On August 27, 2010, Ibrahim pleaded guilty to three counts of the Superseding Indictment: attack to plunder a vessel, act of violence against persons on a vessel, and use of a firearm during a crime of violence. On November 29, 2010, the Court sentenced Ibrahim to 360 months of imprisonment and the Government dismissed the remaining counts of the Superseding Indictment. In the meantime, the Government filed an interlocutory appeal of the Court's August 17, 2010 Order.

On May 23, 2012, the United States Court of Appeals for the Fourth Circuit issued an opinion vacating the Court's dismissal of the piracy count. *United States v. Said*, 680 F.3d 374 (4th Cir. 2012). *See also United States v. Dire*, 680 F.3d 446, 465 (4th Cir. 2012) (upholding an instruction to the jury that the crime of piracy includes "any of the three following actions: (A) any illegal acts of violence or detention or any act of depredation committed for private ends on the high seas or a place outside the jurisdiction of any state by the crew or the passengers of a private ship and directed against another ship or against persons or property on board such ship; or (B) any act of voluntary participation in the operation of a ship with knowledge of facts making it a pirate ship; or (C) any act of inciting or of intentionally facilitating an act described in (A) or (B) above").

The Government then filed the ten-count Second Superseding Indictment on August 8, 2012. Defendants Said, Jama, and Cabaase were named in all ten counts. Defendants Osman

3

and Farah were named in nine of the ten counts (all excluding Count Nine, which related solely to the February 2010 incident involving the British vessel described above). The ten counts and the applicable penalties are as follows:

- Count 1: Conspiracy to Commit Hostage Taking, 18 U.S.C. § 1203(a) (any term of years or life imprisonment)
- Count 2: Conspiracy to Commit Kidnapping, 18 U.S.C. § 1201(c) (any term of years or life imprisonment)
- Count 3: Conspiracy to Perform Act of Violence Against Persons on a Vessel, 18 U.S.C. § 2291(a)(9) (0-20 years of imprisonment)
- Count 4: Conspiracy Involving Firearm and a Crime of Violence, 18 U.S.C. § 924(o) (any term of years or life imprisonment)
- Count 5: Piracy Under the Law of Nations, 18 U.S.C. §§ 1651 & 2 (mandatory life)
- Count 6: Attack to Plunder Vessel, 18 U.S.C. §§ 1659 & 2 (0-10 years of imprisonment)
- Count 7: Assault with a Dangerous Weapon on Federal Officers and Employees, 18 U.S.C. §§ 111(a)(1), 111(b) & 2 (0-20 years of imprisonment)
- Count 8: Act of Violence Against Persons on a Vessel, 18 U.S.C. §§ 2291(a)(6) & 2 (0-20 years of imprisonment)
- Count 9: Use/Possession of a Firearm During a Crime of Violence, 18 U.S.C. §§ 924(c)(1)(A) & 2 (5 years to life to run consecutively)
- Count 10: Use/Possession of a Firearm During a Crime of Violence, 18 U.S.C. §§ 924(c)(1)(A) & 2 (25 years to life to run consecutively)

At the end of a six-day jury trial, on February 27, 2012, Defendants were convicted of all counts of which they were charged. As to Count 10, the jury also found that a firearm had been discharged. Dkt. Nos. 204, 206, 208, 210, & 212.

Prior to the Defendants' scheduled sentencing hearings, on October 4, 2013 they submitted a joint motion contending that the Court should "enter an order finding that it is not limited to imposing a mandatory life sentence for the offense of piracy under 18 U.S.C. § 1651." Dkt. No. 245, at 1. They argue that a life sentence on the piracy count would be grossly disproportionate and therefore violate the Eighth Amendment of the United States Constitution. The Government filed a Response in Opposition on October 11, 2013, Dkt. No. 257, and Defendants filed a Reply on October 15, 2013, Dkt. No. 258. On October 16, 2013, the day of the first scheduled sentencing hearings, the Court continued all of the sentencings pending its

4

consideration of Defendants' motion.

## II. DISCUSSION

### 1. Applicable Legal Framework

The Eighth Amendment of the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Defendants' challenge concerns the final clause, which proscribes cruel and unusual punishments and is concerned not only with excessively barbaric or inhumane treatment, but also with proportionality. "The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Graham v. Florida*, 560 U.S. 48, 59 (2010) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). Eighth Amendment challenges to the proportionality of a sentence are typically either categorical or based on the circumstances of an individual case. The Supreme Court has most recently decided cases involving categorical challenges to a sentencing scheme: for example, whether a sentence of mandatory life without parole for those under the age of 18 at the time of their homicide crimes is cruel and unusual punishment. *Miller v. Alabama*, 132 S. Ct. 2455 (2012). But the Supreme Court has also taken up cases in the latter category, which consider "all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Graham*, 560 U.S. at 59.

Defendants do not contend that a mandatory life sentence for piracy is unconstitutional in every case, but instead rely upon the lack of harm they themselves inflicted, their lack of criminal records, and other individual considerations to argue that it would be unconstitutional to

5

sentence them to life in prison. Accordingly, the appropriate analysis is that which the Supreme Court has set forth for the individualized category of cases, where the key question is whether the sentence "is grossly disproportionate for a particular defendant's crime." *Id.* at 60. To answer that question, a court must first compare the gravity of the offense and the severity of the sentence. Second, if that comparison yields "an inference of gross disproportionality," which should be a "rare" result, then a court should next compare the sentence with sentences received with other offenders in the same jurisdiction and with sentences imposed for the same crime in other jurisdictions. If that analysis confirms that the sentence is grossly disproportionate, then to impose the sentence would violate the Eighth Amendment. *Id.* (citing *Harmelin v. Michigan*, 501 U.S. 957 (1991)).

"The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003). Since 1980, the Supreme Court has taken up cases requiring an individualized analysis six times, and found a constitutional violation only once. Most recently, in *Ewing v. California*, 538 U.S. 11 (2003), the Court upheld a twenty-five-years to life sentence for felony grand theft of three golf clubs valued at approximately $1,200 pursuant to California's "Three Strikes" law, where the defendant had a long history of felony recidivism including robbery and residential burglary. In *Harmelin v. Michigan*, 501 U.S. 957 (1991), the Court upheld a mandatory life sentence without possibility of parole for the possession of over 650 grams of cocaine where the defendant had no prior felony convictions. The Court has also rejected Eighth Amendment claims in three cases arising in a habeas corpus posture (the most recent arising under the deferential posture of the Antiterrorism and Effective Death Penalty Act), upholding a forty-year sentence for possession and distribution of less than nine ounces of marijuana, *Hutto v. Davis*, 454 U.S. 370 (1982), a

mandatory life sentence under a recidivist statute for three theft-related felonies totaling less than $230, *Rummel v. Estelle*, 445 U.S. 263 (1980), and two 25 year to life sentences for petty theft under California's 'Three Strikes" law, *Lockyer*, 538 U.S. 63 . In *Solem v. Helm*, however, the Court affirmed that the Eighth Amendment does impose some constraints on the proportionality of sentences. In that case, which also arose in a habeas posture, it found that a sentence violated the Eighth Amendment where the defendant had received a mandatory life sentence without parole for a seventh felony, which was writing a bad check for $100, where the first six felony convictions were non-violent. 463 U.S. 277 (1983).

The most recent of these cases was decided over ten years ago. Since then, the Court has been more receptive to Eighth Amendment claims of disproportionate sentences, albeit in the context of categorical challenges raised by juvenile offenders. *See Roper v. Simmons*, 543 U.S. 551 (2005) (death penalty for juvenile homicide offenders violates the Eighth Amendment); *Graham*, 560 U.S. 48 (life without parole violates the Eighth Amendment when imposed on juvenile nonhomicide offenders); *Miller*, 132 S. Ct. 2455 (mandatory life imprisonment for those under 18 at the time of their crimes violates the Eighth Amendment). In any event, the Eighth Amendment's focus on proportionality is to be viewed "less through a historical prism than according to the evolving standards of decency that mark the progress of a maturing society." *Miller*, 132 S. Ct. at 2463 (quotations omitted). And it is this Court's duty to address whether imposing a life sentence on Defendants in this case would be grossly disproportionate, considering those evolving standards of decency.

The Court must also consider precedent from the United States Court of Appeals for the Fourth Circuit. Only few published cases have given significant consideration to the issue, and it appears that the Fourth Circuit has never "reversed a sentence that fell within the statutory range

7

on grounds of disproportionality." *United States v. Myers*, 280 F.3d 407, 416 (4th Cir. 2002). Most notably, in *United States v. Kratsas*, 45 F.3d 63 (4th Cir. 1995), the Fourth Circuit rejected a proportionality challenge of a defendant who received a mandatory life sentence for a conviction of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine. It emphasized that the defendant was a repeat drug offender and was neither simply a drug user nor a single distributor, but part of a ring of distributors and was attributed with 18 kilograms of cocaine. *Id.* at 68.

Defendants contend that the deferential gross proportionality principle should be relaxed in this case because Defendants' conduct did not constitute piracy at the time that Congress first affixed a life sentence to the crime of piracy. Gross proportionality is grounded in part, Defendants argue, in deference to Congress's penological judgment, and they contend that Congress made no such judgment in this case. While the amorphous definition of piracy is relevant to the analysis in certain respects (as discussed below, it demands particularly careful consideration of Defendants' individual conduct and also warrants greater weight to the inter-jurisdictional analysis), the Court finds that it does not support a less stringent gross disproportionality principle. Although Congress might not have envisioned Defendants' piratical conduct in 1909, it made the explicit judgment that piracy, however defined by the international community, merits a life sentence. Though the prescribed sentence has remained unchanged in the era of modern piracy, Congress has also expressed its intent to punish lesser conduct of piracy by enacting other pirate statutes which carry lesser penalties than life imprisonment. *E.g.*, 18 U.S.C. § 1659 (attack to plunder carries a maximum of ten years); 18 U.S.C. § 2280 (violence against maritime navigation carries a maximum of twenty years unless death results). However, the Eighth Amendment must be applied in light of today's "standards of decency" and will

therefore incorporate modern norms regarding appropriate punishment.

Finally, although Defendants do not appear to place much weight upon the mandatory nature of the penalty, the Court notes that "*Harmelin* squarely establishes that the mandatory nature of a non-capital penalty is irrelevant for proportionality purposes." *United States v. Farley*, 607 F.3d 1294, 1343 (11th Cir. 2010) (citing *Harmelin*, 501 U.S. at 994–95 (opinion of the Court); *id.* at 1006 (Kennedy, J., concurring)).

### 2. Comparison of the Severity of the Crime with the Gravity of the Conduct

As discussed above, the first step in the applicable analysis is a comparison of the gravity of the offense and severity of the sentence to determine whether there is an inference of gross proportionality. As the Government acknowledges, "[a] mandatory life sentence is the second most severe criminal sentence" available. Resp. of the United States in Opp., Dkt. No. 257 (hereinafter "Opp."), at 18. Accordingly, it is undisputed that the statutorily-mandated punishment is severe and at the very upper end of available criminal sentences.

It is undoubtedly true that as a general matter, the crime of piracy is a very grave offense. It involves often vulnerable and unarmed victims on the high seas. After boarding a vessel and taking it over by force, pirates may hold the crew members hostage for years and often worse, all in the pursuit of a monetary reward. For example, in a case recently prosecuted in this District, the Government alleged that the Defendants boarded a sailing vessel, took the four people on board hostages, and then intentionally shot and killed them when threatened with force from the United States military. *See United States v. Salad, et al.*, No. 2:11cr34, Dkt. No. 237. In *United States v. Shibin*, 722 F.3d 233, 235-36 (4th Cir. 2013), pirates held the crew for ten months and inflicted "psychological and physical torture." The severe and grievous harm occurring in many piracy cases undoubtedly led Congress in 1909 to designate piracy as one of the handful of

crimes in the United States Code that carries a mandatory minimum life sentence. 757 F. Supp. 2d at 562.

But consideration of the general severity of the crime is not nearly the end of the analysis, because what is critical is the gravity of the conduct of the individual defendant raising the constitutional claim. *See United States v. Reingold*, 731 F.3d 204, 216 (2d Cir. 2013) (concluding that "[t]he circumstances of this case do not mitigate the general severity of such criminal conduct [dissemination of child pornography]"). Moreover, unlike most federal crimes that have specifically delineated elements, the crime of piracy is defined by the "law of nations," 18 U.S.C. § 1651, which is continually evolving, *Dire*, 680 F.3d at 467, and can encompass an extraordinarily large scope and variety of criminal conduct. It is therefore particularly important to consider the conduct of the individual defendants in this case. For these reasons, although the Congress's penological judgment is undoubtedly entitled to significant deference, *Ewing*, 538 U.S. at 25, the Court must focus on what actually occurred in this case.

In *Solem*, the Supreme Court delineated a non-exhaustive list of factors that may be relevant at this stage of the analysis: "the harm caused or threatened to the victim or society," "the culpability of the offender," and "the absolute magnitude of the crime" (*e.g.*, stealing a hundred dollars versus a million dollars). 463 U.S. at 292-93. With those principles in mind, here is the Government's account of what transpired on April 10, 2010:

> On April 10, 2010, the defendants . . . approached the USS Ashland (Ashland), a United States Naval amphibious landing ship, from the aft by traveling at a high rate of speed in a small skiff. The purpose of all men on the skiff, including the defendants, was to find a merchant vessel at sea, attack it, seize the merchant ship, and to take the ship and the people on it back to Somalia to hold for ransom. To accomplish this goal, the skiff was equipped with two motors, enabling it to travel quickly. On board was a hooked ladder that is used by pirates to board the larger vessels they attack. The men were armed with three automatic AK-47 firearms and a RPG launcher, though the projectiles they had on hand would not work in the launcher. As the men approached the Ashland, defendant Said held an AK-47 in his lap. Defendant Jama attempted to load a

10

rocket-propelled grenade (RPG) for use in the attack, and defendant Cabaase wielded an AK-47. The defendants possessed another AK-47, which lay at the bottom of the skiff. Defendant Farah drove the skiff. Finally, defendant Osman stood ready to participate in this attack and the seizure of another vessel, and had previously supplied one of the AK-47's that were being used by the defendants.

As the skiff drew near the Ashland, defendant Cabaase raised his AK-47 and began firing at the Ashland. This shooting, or portions of it, was witnessed by a number of United States service members on the Ashland . . . . Several of these witnesses testified that they could tell the person shooting from the small boat was actually shooting at the Ashland, and several of them heard sounds that they associated with bullets hitting the Ashland.[ Footnote 1: The FBI's forensic examination of the Ashland, conducted after the shooting, was inconclusive as to whether the areas examined by the FBI had been impacted by a bullet or some other object.] . . . .

[A crewmember] . . . was given permission to return fire. He returned fire. His first shot he believed hit one of the individuals on the skiff. His second shot caused the skiff to explode in flames. . . . Meanwhile on the skiff, most men had jumped overboard after the skiff was impacted by [the] second round. Defendant Ibrahim, who remained on the skiff, threw the RPG overboard and two of the AK-47's. The defendants came back to the skiff, and they attempted to extinguish the flames . . . .

When all the men were in the water, they discussed the need to come up with a "story" to tell the U.S. Navy to try and get out of trouble. The story they agreed to tell the Navy was that they were human smugglers. . . . The U.S. Navy rescued the five defendants and defendant Ibrahim. The Navy also took pictures of the burnt remains of their boat, which showed the remains of the hooked ladder and the burnt remains of an AK-47 . . . .

Opp. at 5-7.

In sum, this was not a run-of-the-mill case of modern piracy. Although the incident was indeed a violent act, Defendants caused no physical harm at all. Indeed, the only physical harm directly resulting from the event was to the pirates themselves. One of the Defendants fired at the *Ashland*, and may or may not have actually hit it. No victims were caused any physical harm, and it is unclear whether there was even any property damage. Defendants did not board the ship or have any physical contact with it or the people on board. Of course, *Solem* directs consideration of Defendants' culpability and the threat they pose to society, so the Court cannot ignore what Defendants undoubtedly intended to do: board what they thought was an

unprotected merchant vessel and take its crew hostage. But even though Defendants' conduct was a completed act of piracy, the law recognizes a distinction between harm intended and harm caused, and almost always gives more weight to the latter. For example, attempted murder is punishable under federal law by a maximum prison sentence of twenty years, 18 U.S.C. § 1113, whereas murder in the first degree "shall be punished by death or by imprisonment for life," 18 U.S.C. § 1111. As the Court noted in *Solem*, courts have held that rape is more serious than assault with intent to commit rape, and noted generally that "attempts are less serious than completed crimes." 463 U.S. at 293. Similarly, threats to commit an act are punished less severely than the threatened act itself would be. For example, transmitting a ransom demand is punishable up to 20 years and transmitting a threat to kidnap is punishable up to 5 years, 18 U.S.C. § 875, but kidnapping itself (without resulting in death) is punishable for up to life. 18 U.S.C. § 1201.

As this shows, the harm a defendant actually inflicted is traditionally recognized by society as the key factor in selecting punishments, with physical violence to other persons meriting the most severe punishment. The label of piracy and the connotations it has traditionally carried can only go so far. Defendants attacked a heavily defended warship, not a vulnerable yacht or merchant vessel, were completely unsuccessful in that attempt, and inflicted no physical harm. And Defendants have no prior criminal record, unlike the recidivist defendants in many of the precedents discussed above. In such circumstances, a comparison with the most second severe sentence available yields an inference of gross disproportionality.

The Government emphasizes the presence of violence in this case and comes close to arguing that a life sentence is always appropriate for a crime involving violence. But the Supreme Court has never said so, and indeed has stated that "the presence or absence of violence

does not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal." *Rummel v. Estelle*, 445 U.S. 263, 275 (1980). And any inference that violence is dispositive in the Eighth Amendment proportionality analysis is undermined by the Supreme Court's recent cases in the juvenile context, particularly its recent holding that a life sentence for juvenile homicide offenders may not always be appropriate. *Miller*, 132 S. Ct. 2455.

### 3. Comparison to Sentences in Other Cases

Having found that there is an inference of gross disproportionality, the Court must proceed to an intra- and inter-jurisdictional analysis.

#### a. Intra-Jurisdictional Analysis

In the intra-jurisdictional analysis, Defendants' life sentence should be compared to "the sentences imposed on other criminals in the same jurisdiction. If more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Solem*, 463 U.S. at 291. A review of the federal criminal statutes carrying a mandatory minimum life sentence[1] prepared by the Congressional Research Service indicates that besides a few statutes punishing recidivist offenders (which Defendants are not) for certain offenses involving drugs, guns, sex with a minor, or other serious violent felonies, almost all such crimes involve the death of another person. Charles Doyle, Federal Mandatory Minimum Sentencing Statutes, at 101-16 (Sept. 9, 2013), available at http://www.fas.org/sgp/crs/misc/RL32040.pdf. In the Court's view, causing the death of another person is more serious than Defendants' conduct in this case. The Report also reveals that

---

[1] Many other crimes *allow* but do not require a sentence of life imprisonment. The Court references those with a mandatory penalty not because their mandatory nature is relevant to this analysis, but because the Court can assume that defendants convicted of those crimes actually receive a life sentence, a more helpful comparison in a proportionality analysis.

13

crimes that could be considered more serious than Defendants' conduct are punishable by a term less than life. For example, kidnapping the President (as long as no death results) or second degree murder of the President does not require the imposition of a life sentence, but is punishable by imprisonment for any term of years or life. 18 U.S.C. § 1751.

As the Government notes, a subset of other piracy offenses also carry a mandatory life sentence. *See* 18 U.S.C. § 1652 (pirates who are U.S. citizens); 18 U.S.C. § 1653 (aliens as pirates); 18 U.S.C. § 1655 (assault on commander as piracy); 18 U.S.C. § 1661 (robbery ashore). But as already noted, this case is far afield from the typical piracy case prosecuted today in federal courts. Although another case with very similar circumstances was prosecuted in this district and resulted in life sentences, *see Dire*, 680 F.3d 446, the Government does not contest Defendants' assertion that "other than the defendants in *Dire*, every defendant convicted under § 1651 in recent years committed either robbery on the high seas or homicide or both." Defts' Joint Motion, Dkt. No. 245, at 9. For example, the defendant in *Shibin* acted as the negotiator in two piracy events. In one, he boarded the ship after it was taken into Somali waters and participated in the torture of the crew. In the other, the four Americans on board were killed. He was prosecuted and convicted under § 1651 under aider and abettor liability, and was sentenced to 12 terms of life imprisonment, among other terms of years sentences. 722 F.3d 233 (4th Cir. 2013). In a case recently prosecuted in this District, the Government alleged that the Defendants boarded a sailing vessel, took the four people on board hostages, and then intentionally shot and killed them when threatened with force from the United States military. *See United States v. Salad, et al.*, No. 2:11cr34. The defendants were convicted of piracy and received multiple life sentences. By contrast to these cases, the conviction with facts most analogous to this case is of Defendants' co-defendant Ibrahim, who pleaded guilty to non-piracy charges and was sentenced

to 360 months in prison.

Defendants who engage in conduct just like the some of the worst piracy offenders but are convicted under other statutes have received more favorable sentences than the Government seeks in this case. For example, the defendant in *United States v. Shi*, 525 F.3d 709 (9th Cir. 2008) was convicted by a jury of interfering with the safe navigation of a maritime vessel through the use or threat of force after he seized control of a fishing vessel killed two other crew members, and sentenced to 36 years' imprisonment. *See id.* at 723 ("[T]he acts with which Shi is charged constitute acts of piracy."). The surviving pirate of the incident on which the recent film *Captain Phillips* was based pled guilty to hijacking, kidnapping, and hostage taking and was sentenced to 33 years and 9 months in prison. *United States v. Muse*, 1:09-cr-512 (S.D.N.Y.).

In sum, a comparison of the circumstances of this case with other federal penalties indicates that imposing a life sentence in this case would penalize less grievous conduct than that of offenders subject to life imprisonment for other crimes. It also indicates that other piracy offenders who cause far more harm than Defendants receive a life sentence or even a lesser term of years.

### b. Inter-Jurisdictional Analysis

An inter-jurisdictional comparison of "the sentences imposed for commission of the same crime in other jurisdictions," *Solem*, 463 U.S. at 300, also confirms that a life sentence in this case is grossly disproportionate. Given the dearth of state piracy convictions, the most applicable comparison is to other nations' punishments for piracy. International punishments are especially relevant for a crime explicitly defined by the law of nations, and the Court accords this factor particular weight in this case. A comparison with the approaches of other nations is also in accord with recent Supreme Court cases, which have found relevant in an Eighth Amendment

analysis the "judgments of other nations and the international community." *Graham*, 560 U.S. at 80.

It is clear that a life sentence for the conduct in this case is unique internationally. The Government has little response to Defendants' assertion that "[n]o jurisdiction outside the United States calls for a mandatory life sentence for piracy when there has not also been robbery and physical harm caused to another person." Defts' Joint Motion, at 10 (citing Eugene Kontorovich, The Penalties for Piracy: An Empirical Study of National Punishment for International Crime, Northwestern Public Law Research Paper No. 12-16 (July 10, 2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2103661). The global average sentence for piracy is just over 14 years. Kontorovich, at 1. The research paper they rely upon notes that the United States "is an outlier in its punitive severity." *Id.* at 17. It reviewed 256 sentenced Somali pirates, with cases coming from 12 different countries outside of Somalia, and found that outside of the United States, there was only one case where the pirates received a life sentence. *Id.* at 12-13. Those pirates were sentenced in South Korea and had caused the death of the ship's captain. Defts' Joint Motion, at 10-11.

Therefore, an inter- and intra-jurisdictional analysis confirms that imposing a life sentence as punishment for Defendants' conduct would be grossly disproportionate. The statutorily-mandated sentence violates the Eighth Amendment and cannot be imposed.

## III. CONCLUSION

For the reasons previously stated, Defendants' Joint Motion for Ruling Regarding Inapplicability of Statutory Mandatory Minimum Punishment for Piracy Offenses is **GRANTED**. Further, the parties are **ORDERED** to submit briefs no longer than fifteen (15) pages regarding the appropriate sentence for the piracy charge within **TWENTY-ONE (21) DAYS** of the date of entry of this Order.

The Clerk is **DIRECTED** to send a copy of this Order to the parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
February 28, 2014

Raymond A. Jackson
United States District Judge